UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **MICHAEL L. LEWIS,** ) | Case No. 1:12 CV 3003 |
| ) | |
| **Plaintiff,** ) | Judge Dan Aaron Polster |
| ) | |
| vs. ) | **MEMORANDUM OF OPINION** |
| ) | **AND ORDER** |
| **THE CLEVELAND CLINIC FOUND.,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

Before the Court is Defendants' Motion for Summary Judgment. (**Doc ##: 22, 23**.) Plaintiff Michael Lewis, a former Cleveland Clinic Police Officer, has sued the Clinic for his compelled resignation on February 24, 2011. Lewis claims that he was discharged in violation of state and federal discrimination laws based on his race, African-American. The Court has reviewed the Motion, the Opposition Brief (Doc #: 31), the Reply Brief (Doc #: 33) and the record evidence thereto. For the reasons to follow, the Court **GRANTS** the Motion, and enters judgment in favor of Defendants.

**I.**

Defendant Cleveland Clinic Foundation ("the Clinic") hired Plaintiff Michael Lewis as a Clinic police officer in August 2008. Although former Chief Kalavsky (Caucasian) hired Lewis, it is undisputed that the two individual Defendants named in this case, Chief David Easthon (Caucasian) and Commander Robert Sims (African-American), were involved in and approved the decision to hire Lewis. (Easthon Dep. 57-59; Sims Declaration ¶ 4.) The evidence shows

-1-

that Lewis had significant difficulty writing reports and retaining basic information, and that he was placed on performance improvement plans ("PIP") by two different supervising officers, Clinic Lieutenants Beulah Payne (African-American) and Barbara Smith (African-American). (Doc ##: 25-9 (Lt. Smith PIP) and 25-11 (Lt. Payne PIP).  See also Doc #: 25-10 (Smith Memorandum to Chief Easthon dated 3/23/2009, setting forth Lewis' work issues).)  Despite these reports, Chief Easthon, of his own accord, extended Lewis' 90-day probationary period, and provided him with additional training and resources in the hope that his performance would improve.  (Easthon Decl. ¶ 7.)

All of this came to a quick halt in the wee hours of February 6, 2011.  Cleveland Patrol Officers Brian Kluth and Jennifer Koch responded to a call by Lewis' neighbor, Mary Bolton, complaining about a male who had threatened her with a gun.  (Doc #: 22-1 ("Kluth Decl.") ¶ 4.) Upon arrival at the apartment, Bolton told Officer Kluth that Lewis had threatened her and her son while holding a handgun.  (Kluth Decl. ¶ 5.)  Kluth observed Lewis and a female in the hallway, and saw that Lewis was wearing a gun.  (Id.)  When Kluth entered Lewis' apartment, he saw open beer cans and a bottle of liquor, and smelled alcohol on his breath.  (Id.)  Lewis admitted having some drinks.  (Id.)  Cleveland Police Sergeants Dorothy Todd and Aman Gamble (Kluth and Koch's supervisor), and Officer Martina Latessa responded to Kluth's call for backup assistance.  (Doc #: 22-2 ("Todd Decl.") ¶ 4; Doc #: 22-3 ("Latessa Decl.") ¶ 4; (Doc #: 22-4 ("Gamble Decl.") ¶ 4.) .)  Upon arrival, Sergeant Todd disarmed Lewis of his gun and handcuffed him for officer safety.  (Todd Decl. ¶ 5.)  The responding officers all observed that Lewis was responding to Officer Kluth's questions in a loud, shouting manner, saw open cans of beer and a bottle of liquor in Lewis' apartment, and smelled alcohol on his breath.  (Todd Decl. ¶ 5; Latessa Decl. ¶ 5; Gamble Decl. ¶ 5.)   Based on these findings, Officer Kluth, with

Sgt. Gamble's consent, arrested Lewis for possessing a weapon while intoxicated, aggravated menacing, and unnecessary noises, and transported him to the City of Cleveland Jail. (Kluth Decl. ¶ 6; Gamble Decl. ¶ 7.)

From jail, Lewis contacted Lt. Beulah Payne, his supervisor at that time, and reported that he was arrested for an off-duty incident involving his girlfriend and an altercation with a neighbor. (Doc #: 22-5 ("Payne Decl.") ¶ 4.) Lewis told Lt. Payne that he had had a couple beers. (Id.) She advised him that she would have to contact Commander Gerald Loudin or Chief Easthon to report the arrest, and she advised that someone from the Clinic Police Department would contact him. (Id.) Because she was unable to reach Commander Loudin, she contacted Chief Easthon and reported Lewis' arrest and their conversation. (Payne Decl. ¶ 5.) Easthon then contacted Commander Sims and instructed him to begin an internal investigation. (Doc #: 28 ("Easthon Dep.") at 83-85; Doc #: 23-2 ("Sims Decl.") ¶ 5.)

Commander Sims began his investigation by directing Clinic Detectives Stanley Kaczynski (Caucasian) and Sean Thomas (African-American) to go to the Cleveland Jail and obtain Lewis' badge and Clinic-issued identification, and to obtain a written statement from Lewis should he choose to give one. Lewis handwrote the following statement:

> On 02-05-2011 APPROX 2:30 I WAS GOING TO MAIL BOX. CAME BACK ON ELEVATOR. I NOTICE JACKIE MY FRIEND WAS ARGUMENT WITH FEMALE DOWN HALLWAY. I TOLD JACKIE LETS GO BACK TO MY APARTMENT. THE FEMALE NEXTS DOOR STATED THAT SHE HAVE SOMETHING IN HER APARTMENT FOR ME. I THEN TOLD JAKIE LETS GO. WE WENT BACK TO APARTMENT AND I HAD A BEER. NEXT THING CPD KNOCK AT MY DOOR.

(See Doc #: 25-13.) Detectives Kaczynski and Thomas interviewed Mrs. Bolton in the presence of her 25-year old son, who also witnessed the February 6 altercation and confirmed his mother's

version of events. (The report of that interview is located at Doc #: 23-2, at 23-24.) The detectives also interviewed the apartment complex's security guard, Kennard Jordan, who witnessed part of the incident. (The report of that interview is located at Doc #: 23-2, at 25. Additionally, Kennard Johnson's handwritten statement is located at Doc #: 23-2, at 26.) Mrs. Bolton reported that she had had issues with Lewis playing loud music in the past. She explained, however, that she would usually knock on his door, ask him to turn it down, and "there [were] usually never any problems." (Doc #: 23-2, at 23.) This time was different. Although Mrs. Bolton's and Mr. Jordan's recounting of the incident has some inconsistencies, these witnesses all reported that Lewis had a gun in his hand, flashed his badge, and identified himself as Cleveland police. (Id.)

Commander Sims directed Clinic Sergeant Edward Sanek to obtain the Cleveland Police Department file involving the February 6 incident. (Sims Decl. ¶ 5; Attachment 1, Doc #: 23-2, at 5-21.)

Based on his review of the various records, Commander Sims drafted an eight-page report concluding that Lewis violated multiple Clinic and Clinic Police Department policies and standards of conduct.[1] (Doc #: 23-2, at 27-34.) He concluded, "Based upon the totality of the circumstance[s], it is my recommendation without prejudice that employee Michael Lewis (#837801) be separated from the agency." (Id. at 34.)

On February 17, 2011, Chief Easthon held a meeting with Michael Lewis at the Clinic police department's headquarters. (Doc #: 23-2, at 35-36.) Attending the meeting were Lt.

---

[1] Although the date on the report is February 8, 2013, Commander Sims avers that he began drafting the report on that date, but did not complete it until after he reviewed all the information provided by Officers Kaczynski, Thomas, and Sanek, cited above. (Sims Decl. ¶ 9.)

-4-

Payne, Sgt. Virginia Caldwell, Sgt. Ed Smith, and Commander Sims.  (Id.)  Following the meeting, Commander Sims wrote a report summarizing the meeting as follows:

> Chief Easthon asked Mike to tell us what he recalls from the incident on the night he was arrested.  Mike [Lewis] stated he went bowling prior to the incident.  He returned to his apartment and he fixed himself a drink.  When asked how many drinks he had consumed?  Lewis replied he had a shot of Sterling Vodka and a beer.  The Chief asked him, was it just one shot?  Lewis replied 1 or 2 shots and a beer.
>
> He admitted to playing his music loud and later turned it down.  Next thing he knows the police are knocking at his door and placed him against the wall.  Mike said the woman next door must have seen his gun in the holster, but he never had it out.  That's about it, he said.
>
> I asked Mike Lewis did he recall a Security Officer at the scene.  Mike said yes, he forgot all about him.  Mike Lewis told me that even the security person must have seen the gun in his holster under his jacket when he reached for his female friend.  Again, he stated the weapon was never in his hand, but in the holster.
>
> The accounts of the events of February 6, 2011 as described by Mike Lewis differ from the statements written by the security officer and victim.  Both witness and victim indicate the weapon was clearly in the hand and no one reported ever seeing a holster.
>
> The security officer at the apartment complex did see a badge, but the security officer stated that Mike Lewis identified himself as a [Cleveland Police Officer].  Mike did advise he showed his badge at some point during the altercation, but denies ever telling anyone he was [Cleveland police].  The security officer says he is absolutely sure that Mike said [Cleveland police] and not [Cleveland Clinic police].
>
> Chief Easthon asked Mike Lewis about the girlfriend.  Mike said she did not do drugs, but she drinks and there was no criminal history.  Mike said the woman was also married and her husband was handicapped.
>
> Mike Lewis told us the courts gave him "time served" for the noise complaint and his plea was "no contest" on all other charges.
>
> Mike Lewis originally had written a statement when he met with detectives earlier this month.  The statement was very vague, just as this oral statement given on 2-17-2011.  The facts that Mike Lewis recall are facts

-5-

> minimizing his activity during the altercation at the apartment complex. The story is not consistent with the victim and witness, who both appear to be credible and non-deceptive.

(Doc #: 23-2, at 35-36.)  Chief Easthon scheduled a followup meeting to be held on February 24, 2011. (Id.)

Attending the meeting on February 24, 2011, were Lewis, Chief Easthon, Commander Sims, Sgt. Ed Smith, and HR representative Melissa Frank. (Doc #: 23-2, at 37.) Chief Easthon gave Lewis the option to resign or face termination based on the February 6, 2011 incident. (Id.) After Lewis discussed these options with his wife, he decided to resign with an effective date of March 2, 2011. (Id.)

On October 29, 2012, Lewis filed a complaint asserting state and federal claims for workplace discrimination and retaliation, a federal due process claim under 42 U.S.C. § 1983, and state-law claims for intentional infliction of emotional distress, defamation and civil conspiracy. Defendants removed the case to federal court based on federal question jurisdiction over the federal claims and supplemental jurisdiction over the state-law claims.

At a Case Management Conference held on January 3, 2013, Plaintiff's counsel acknowledged that his client could not bring federal discrimination claims against his former supervisors, and that he could not bring a civil conspiracy claim against any of the Defendants based on the intracorporate conspiracy doctrine. Accordingly, he filed an amended complaint asserting federal race discrimination and retaliation claims against the Clinic and the Clinic Police Department; state race discrimination and retaliation claims against the Clinic, the Clinic Police Department, and the individual Defendants; a § 1983 due process claim against the Defendants, and state-law emotional distress and defamation claims. (Doc #: 13.) In a

Memorandum of Opinion and Order dated March 13, 2013, the Court issued an order dismissing Plaintiff's § 1983 due process claim with prejudice.  (Doc #: 18.)

On October 1, 2013, Defendants filed the pending summary judgment motion, which was followed by Plaintiff's opposition brief and Defendants' reply.  (Doc ##: 22, 23, 31, 33.)

As a preliminary matter, Defendants correctly point out that Lewis failed to oppose, let alone mention, Defendants' arguments with regard to his state and federal retaliation claims, his claims for intentional infliction of emotional distress and defamation, the claims against the individual Defendants (Chief Easthon and Commander Sims), the claims against the Cleveland Clinic Police Department, and Lewis' prayer for punitive damages.

"'It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.'" *Cunningham v. Tennessee Cancer Specialists, PLLC*, - - F.Supp.2d - -, 2013 WL 3716877, at *18 (E.D.Tenn. July 12, 2013) (quoting *Rouse v. Caruso*, No. 06-CV-10961-DT, 2011 WL 918327, at *18 (E.D.Mich. Feb. 18, 2011) in turn quoting *Hopkins v. Women's Div., Gen. Bd. Of Global Ministries*, 284 F.Supp.2d 14, 25 (D.D.C. 2003)).  *See also Dage v. Time Warner Cable*, 395 F.Supp.2d 668, 679 (S.D. Ohio 2005) (holding that a plaintiff abandoned a claim by failing to address it in the response brief to a summary judgment motion).

The Court has reviewed Defendants' arguments as to those claims and finds that they all have merit.  The Court construes Lewis' failure to oppose these particular arguments as his concession to them.  Thus, the Court grants summary judgment in favor of Defendants on those

laims and dismisses them with prejudice.  Based on this ruling, the only claims remaining for the Court's analysis are the state and federal race discrimination claims against the Clinic.

## II.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact.  Fed. R. Civ. Pro. 56(a).  In considering a summary judgment motion, the Court must construe the evidence in favor of the non-moving party.  *Muncie Power Prod., Inc. v. United Tech Auto Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  However, the court is not "obligated to wade through and search the entire record for some specific facts that might support the non-moving party's claims."  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

Race discrimination under both state and federal statutes are examined under the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.  *Plumbers & Steamfitters, Joint Apprenticeship Comm'n v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192 (1981).  Since there is no direct evidence of race discrimination, Lewis must prove his state and federal claims of disparate treatment through circumstantial evidence.  To do that, Lewis must first set forth a *prima facie* case of race discrimination.

To establish a *prima facie* case of discrimination, a plaintiff must point to evidence in the record showing that: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for his position, and (4) he was treated less favorably than similarly situated non-protected employees. *See. e.g., Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). If the plaintiff succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for taking the adverse employment action. *Id*. If a defendant satisfies its burden, the burden shifts back to the plaintiff who must show that either (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the adverse employment action; or (3) that the proffered reason was insufficient to motivate the adverse employment action. *Id*.

The Clinic contends that Lewis cannot establish a *prima facie* case of discrimination because he cannot show that he was treated less favorably than otherwise similarly situated police officers in his department. Put another way, the Clinic points out that Lewis has failed to identify a similarly situated non-protected Clinic police officer who received better treatment than he did under comparable circumstances.

In the disciplinary context, the Sixth Circuit has held that, to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of comparable seriousness. *Wright v. Murray Guard, Inc*., 455 F.3d 702, 710 (6th Cir. 2006) (inner quotation omitted). The Court may look to factors such as whether the individuals dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of

-9-

hem for it. *Id*. The degree of misconduct is a factor to be given great weight. *Martinez v. Cracker Barrel Old County Store, Inc.*, 703 F.3d 911, 917 (6th Cir. 2013) (citations omitted).

With regard to pretext, the Sixth Circuit has long held that, "[a]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Moreover, "[a]n employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Id*. (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)).

It is undisputed that Lewis meets the first three elements of his prima facie case as the Clinic challenges only the fourth *prima facie* element, i.e., whether Lewis was treated less favorably than similarly situated non-protected employees. Plaintiff's proposed comparators are Clinic officer Paul Steinmetz, and Clinic officers who were named defendants in a civil rights cases before the undersigned – all of whom the Court *dismissed with prejudice* as a matter of law upon a partial motion for judgment on the pleadings. *See Hayward v. Cleveland Clinic Found.*, 878 F.Supp.2d 860 (N.D. Ohio 2012).

### A. Prima Facie Case

#### 1. Paul Steinmetz

Paul Steinmetz is a white Clinic officer who was convicted of driving under the influence of alcohol while off duty. (Doc #: 23-3 ("Kalavsky Decl."), Ex. 8.) According to then-Chief Kalavsky, Steinmetz' supervisor who conducted the internal investigation, the facts are as

follows:

> Officer Steinmetz admitted that he struggled with alcohol abuse after the death of his children and that he was genuinely seeking treatment for his condition. I also reviewed Officer Steinmetz work record which demonstrated that he was a good law enforcement officer. From my communications with Fairview Park police, I also learned that Steinmetz was cooperative with his arresting officer, did not abuse, or even use, his authority as a police officer. He did not mention that he was a Cleveland Clinic police officer in an attempt to mitigate his circumstances.
>
> In making a determination about Officer Steinmetz, I also reviewed a comparable incident involving another Cleveland Clinic officer who was also arrested and convicted for driving while under the influence. That officer was also a good performer, was convicted of his first DUI, admitted to fault and sought help. He, too, was not suspended, but assigned to a walking (non-driving) post while his license was suspended.
>
> Based on my investigation and review of a comparable situation, I independently decided to counsel Officer Steinmetz and assign him to a non-driving assignment as long as he complied with the terms of his sentence, probation and treatment.

(Kalavsky Decl., Ex. 8 ¶¶ 5-6.)

The Clinic correctly points out that, while Steinmetz was convicted of off-duty misconduct, he did not abuse his authority as a police officer during a personal altercation with a neighbor in the middle of the night, he was not wearing a loaded gun and his Clinic police badge while consuming alcohol, and he did not have documented performance issues and struggled as an officer. Furthermore, it is undisputed that Steinmetz was disciplined by then-Chief Kalavsky, ent decisionmaker than Lewis – the same police chief who hired Lewis in the first place.

Lewis contends that Officer Steinmetz is similarly situated to him merely because he was accused of violating the Clinic's various policies or Standards of Conduct, without explaining whether the actual policies or Standards in question are the same, or remotely the same. (See, e.g., Opp. Br. at 14) ("Both Steinmetz and Lewis were alleged to have conducted off duty

-11-

behavior that may be characterized as violations of the Standards of Conduct and other policies of Defendant CCF."} Therefore, he should not have been fired. The Clinic correctly points out that, if this interpretation of the law had any merit, then all employees who violate a company policy or standard of conduct are similarly situated to each other – regardless of the gravity of their conduct or the difference in their positions. *See, e.g., Correll v. CSX Transp., Inc.*, 378 Fed.Appx. 496, 502-03 (6th Cir. 2010) (affirming summary judgment conclusion that comparators were not similarly situated when the plaintiff was disciplined by different supervisors, the plaintiff had a work history of other safety violations, and the plaintiff's conduct was more severe and culpable.); *Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006) (individuals cannot be considered similarly situated for purposes of discipline if "they engaged in different conduct and the differences in their conduct are relevant.")

Lewis suggests that he was treated less favorably than Officer Steinmetz because they both cooperated with the arresting officers, yet Steinmetz was not fired. (See Opp. Br. 14.) Lewis utterly ignores what former police chief Kalavsky says distinguishes Lewis' conduct from that of Officer Steinmetz. In addition to the fact that Officer Steinmetz was not wearing his Clinic badge nor a loaded gun while off duty and drinking alcohol, Kalavsky avers that Steinmetz "did not abuse, or even use, his authority as a police officer" and "did not mention that he was a Cleveland Clinic police officer in an attempt to mitigate his circumstances." (Kalavsky Decl., Ex. 8 ¶¶ 5-6.)

### 2. CCF Officers Involved in the Aaron Hayward Action

Lewis cannot show that the Hayward officers, while treated more favorably, were engaged in the same conduct as Lewis. The Hayward officers were on duty and engaged in law

enforcement activities when they arrested Hayward.  There is no allegation that any of them had used alcohol while carrying their weapons, or that any of them identified themselves as Cleveland police while engaged in a personal, off-duty confrontation with a neighbor at 3:00 a.m.  Finally, the Clinic conducted an internal investigation of the officers and determined that they did not abuse their authority while arresting Mr. Hayward - a fact with which this Court agreed.  *See Hayward v. Cleveland Clinic Foundation*, 878 F.Supp.2d 860 (N.D. Ohio 2012).

Lewis attempts to create a disputed issue of fact by comparing the facts in the *Hayward* case (which was dismissed prior to discovery) to the facts in this case.  Perhaps after reviewing the record, including his own deposition testimony, however, he <u>wisely</u> no longer denies that he consumed alcohol while wearing a loaded gun and flashing his Clinic badge during a confrontation with his neighbor over the volume of music he was playing at 3:00 in the morning.  Rather, he argues that Mrs. Bolton lied when she said that he used foul language and brandished a gun.  Lewis ignores that Mrs. Bolton is not the only witness who reported seeing Lewis carrying a gun in his hand, but also her son and the building security guard.  Even if he were just wearing the gun in a holster, there is still no similarity between the conduct he *admits* committing off duty, and the on-duty conduct of the *Hayward* officers in arresting Mr. Hayward.

Because Lewis cannot show that either Officer Steinmetz or the Hayward officers engaged in conduct remotely similar to his, he has failed to establish the fourth element of his *prima facie* case.

**B.    Pretext**

Even if Lewis were able to establish a *prima facie* case of discrimination, he has failed to show that the Clinic's reason for firing him was pretextual.  Following the completion of

discovery, Lewis is unable to come forward with a shred of evidence remotely suggesting that the decision to terminate his employment lacked a factual basis or that his race, African-American, played *any part* in the decision to fire him. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Lewis admitted at deposition that neither Chief Easthon nor anyone from the Clinic was at Lewis' apartment at the time the altercation occurred on February 6, 2011, so the only way Chief Easthon or anyone from the Clinic could formulate an opinion about what happened that night was by virtue of interviews with the persons who were actually there. (Lewis Dep. 254-56.)

The evidence shows that it is Commander Sims, who conducted the internal investigation and is African-American himself, who recommended that Chief Easthon fire Lewis. This was based on his review of all the documentary evidence before him at the time of Lewis' compelled resignation: i.e., the formal reports prepared by the Clinic detectives who interviewed the witnesses at the apartment; the handwritten statement by the apartment security guard; the Cleveland Police Department records of the arrest, Lewis' voluntary, handwritten statement to Clinic detectives the morning of the arrest; a ten-page letter written on Lewis' behalf by his "brother" Richard Campbell and which he signed but disputed its contents at deposition; Lewis' description of what happened on the evening of February 6, 2011 to Lt. Payne; and Lewis' responses to Chief Easthon's questions at the February 17, 2012 meeting. Commander Sims found inconsistencies between Lewis' version of events and the witnesses' version of events, and (continued)

concluded that the witness' version of events were non-deceptive and credible.[2] (Doc #: 23-2, at 35-36.) Thus, he recommended that Chief Easthon fire Lewis.

The evidence shows that Chief Easthon relied not only on Commander Sims report and the documents compiled by the internal investigation, but that he held a meeting with Lewis himself so that Lewis could present his version of what happened on the evening of February 6, 2011. Indeed, Lewis admitted at deposition that he had "no problem" with Chief Easton. (Lewis Dep. 86.) It is also worth repeating that Chief Easthon and Commander Sims were both involved in the hiring process for Lewis and recommended that the Clinic hire Lewis in 2008.

Lewis challenges the accuracy and completeness of Commander Sims' internal investigation. (Opp. Br. 19.) The law is clear, however, that plaintiff's disagreement with the facts uncovered in an employer's internal investigation does not create a genuine issue of material fact so long as the employer has an honest belief in its proferred nondiscriminatory reason." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007); *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106-17 (6th Cir. 2001). *See also Jones v. Western Reserve Transit Auth.*, 455 Fed.Appx. 640-47 (Jan. ll, 2012 (precluding any inquiry as to whether the employer's decision was correct or optimal); *Braithwaite v. The Timken Co.,* 258 F.3d 488, 94 (6th Cir. 2001) (discrimination plaintiff must prove more than a dispute over the facts upon which the discharge was based).

---

[2]That Lewis lacks credibility is an understatement upon review of his entire deposition . His sworn testimony is inconsistent with his complaint allegations, it is inconsistent with what he himself has written and statements he has made to others, it is inherently inconsistent and, at times, it is just plain incoherent. Perhaps this is why Lewis relies so heavily, in his opposition brief, on the affidavit of Jackie Cook to support his version of the facts. This, too, is problematic because at deposition he testified that Cook is an alcoholic who instigated the altercation on the night in question (Lewis Dep. 104, 183-84) – assertions that are directly at odds with Ms. Cook's averments.

In summary, Lewis has simply failed to establish that the Clinic's decision to fire him was based, correctly or incorrectly, on anything other than Lewis' off-duty conduct in the early morning hours of February 6, 2011.

## IV.

Based on the foregoing, the Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

 */s/ Dan A. Polster     November 27, 2013*
**Dan Aaron Polster**
**United States District Judge**